IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs May 22, 2018

**STATE OF TENNESSEE v. JAMES DOUGLAS BLACK**

**Appeal from the Criminal Court for Greene County**
**No. 12CR149        John F. Dugger, Jr., Judge**

_____

**No. E2017-00542-CCA-R3-CD**

_____

A Greene County jury convicted the Defendant, James Douglas Black, of first degree premeditated murder and first degree felony murder of Courtney Thompson and Terrance Stewart. The trial court imposed concurrent life sentences. On appeal, the Defendant asserts that the evidence is insufficient to support his convictions. After review, we affirm the trial court's judgments, but we remand for entry of corrected judgments reflecting the merger of certain counts.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed and Remanded**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and THOMAS T. WOODALL, J., joined.

Cameron L. Hyder, Elizabethton, Tennessee, for the appellant, James Douglas Black.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Counsel; Dan E. Armstrong, District Attorney General; and Cecil C. Mills, Jr., and Ritchie D. Collins, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**

In the early morning hours of Sunday, March 11, 2012, victims Courtney Thompson and Terrence Stewart were both shot in the head and killed in Ms. Thompson's blue Honda on Newport Highway. The bodies were discarded under a nearby bridge, and the Honda was abandoned in a Perkins restaurant parking lot. For his role in these crimes, a Greene County grand jury indicted the Defendant for two counts of first degree premeditated murder and four counts of first degree felony murder. At trial,

the following evidence was presented: Michelle Shelton testified that she and Ms. Thompson had a close relationship and were "like . . . sisters." Ms. Shelton confirmed that she was aware that Ms. Thompson was a drug dealer. Although Ms. Shelton stated that Ms. Thompson was not "flashy" about her involvement in drug sales, she confirmed that Ms. Thompson carried two cell phones and "at least a couple of grand" in cash on her person. Ms. Shelton testified that, at the time of her death, Ms. Thompson was dating a man named Terrance Stewart.

Ms. Shelton testified that at 10:00 a.m. on Saturday, March 10, 2012, she went to work as a server at "Brandywine." Her work day ended at 11:00 p.m., and Ms. Thompson, Mr. Stewart, and Ms. Shelton's husband, David Shelton, picked her up from work. The four went to Ms. Shelton's apartment. Ms. Shelton recalled that Ms. Thompson's cell phone was ringing "[n]onstop" from the time Ms. Shelton entered the car. At some point, Ms. Thompson answered her phone and asked the caller if he "want[ed] [her] to come back out there." Ms. Shelton stated that she could hear the caller's voice and identified the voice as the Defendant's.

Ms. Shelton testified that prior to March 10, 2012, she had accompanied Ms. Thompson to a yellow trailer ("Hartford trailer") where Ms. Thompson had "some business to take care of." Ms. Shelton went inside the trailer with Ms. Thompson, and the Defendant led the two women to the right back bedroom. He talked with Ms. Thompson as they walked, and he appeared to be "a little upset" with Ms. Thompson. Ms. Shelton and Ms. Thompson were inside the trailer for five to ten minutes before leaving. Ms. Shelton confirmed that Ms. Thompson had crack cocaine and "oxy 30s" with her when they entered the trailer.

Returning to the testimony about March 10, 2012, Ms. Shelton stated that Ms. Thompson wanted her to go with her to the Hartford trailer again, but Ms. Shelton refused. She explained that she was tired after her twelve-hour shift and wanted to go home. Ms. Thompson then asked Mr. Stewart to go with her. At first, Mr. Stewart tried to convince Ms. Thompson not to go, but ultimately he agreed to go with her. Ms. Shelton confirmed that Ms. Thompson always carried a "pearl-handled pistol" "in a Crown Royal bag" and that Ms. Thompson had the gun with her when she left for the Hartford trailer on the night of March 10, 2012. Ms. Thompson and Mr. Stewart left that night in a dark-colored Honda Accord.

Ms. Shelton testified that Ms. Thompson called later to tell her, "she was taking them and they were going to cash a check." Ms. Thompson did not identify who she was taking to cash a check. When Ms. Thompson did not return, Ms. Shelton grew concerned. She repeatedly called and sent text messages to Ms. Thompson's cell phone, but she received no response. She also went to Ms. Thompson's residence at 2:00 or 3:00

a.m., but no one was there. Ms. Shelton noticed, however, that Ms. Thompson's green BMW was at the residence. On Ms. Shelton's way to work the next morning, she noticed that the BMW was no longer there. She explained that she had purchased the car from Ms. Thompson, and Ms. Thompson was to deliver the car to her that day.

On cross-examination, Ms. Shelton agreed that she was the last person seen with Ms. Thompson and Mr. Stewart before their deaths and that she spoke with law enforcement the morning after their deaths. In her initial statement to the police, Ms. Shelton did not mention the Defendant. She agreed that she did not mention the Defendant in relation to this case until five years later. She maintained that her initial statement had not changed, explaining that she did not know the Defendant's name at the time she spoke with law enforcement. She further stated that she answered the questions asked of her, and law enforcement did not ask about her encounter with the Defendant at his trailer. Ms. Shelton confirmed that Ms. Thompson referred to the Defendant familiarly as "Pops."

David Shelton testified that he knew Ms. Thompson through his wife and, at some point, he learned that Ms. Thompson sold drugs. Mr. Shelton developed a friendship with Ms. Thompson's boyfriend, Mr. Stewart. Mr. Shelton described Mr. Stewart as "very quiet," "well-mannered," and the type of person who "would give you the shirt off" his back.

Mr. Shelton testified that while Ms. Shelton worked on March 10, 2012, he drove Ms. Thompson to Knoxville to buy drugs and that Mr. Stewart rode with them. Mr. Shelton confirmed that he "helped" Ms. Thompson "set this up" by arranging for Ms. Thompson to buy drugs from his cousin. When they arrived at the apartment complex in Knoxville, Ms. Thompson purchased crack cocaine.

Mr. Shelton testified that, on the drive back, they stopped at a trailer in Newport, later identified as Fred Green's trailer. Mr. Shelton, Mr. Stewart, and Ms. Thompson all entered the trailer and remained inside for about thirty minutes. Mr. Shelton and Mr. Stewart were in a different room than Ms. Thompson. Mr. Shelton could hear people entering and exiting the trailer, so he assumed that Ms. Thompson was selling the crack cocaine purchased in Knoxville. The three left the trailer and drove to a nearby house. Ms. Thompson went inside alone and, when she returned to the car, she was carrying a plastic bag containing fourteen or fifteen blue "oxy" pills.

Mr. Shelton testified that they returned to his apartment and later that night drove to "Brandywine Creek" to pick up Ms. Shelton. Mr. Shelton recalled that Ms. Thompson's phone had been ringing repeatedly. She answered the phone, and Mr. Shelton heard the conversation because the call was on speaker phone. The male caller

offered a low amount of money for drugs, and the two haggled over price until Ms. Thompson agreed to drive to Hartford to deliver the drugs.

Mr. Shelton testified about his prior experience with the Hartford trailer, clarifying that he, Ms. Shelton, Ms. Thompson and Mr. Stewart went to the trailer on Friday, March 9, 2012. He testified that the night of March 10, 2012, Ms. Thompson and Mr. Stewart left to drive to the Hartford trailer. Additionally, Mr. Shelton explained that, when Ms. Thompson and Mr. Stewart left that night, the arrangement was for Ms. Thompson and Mr. Stewart to return to the Sheltons' apartment for the night. About forty-five minutes after Ms. Thompson left, Mr. Shelton grew concerned and called Ms. Thompson. Ms. Thompson assured him that she was alright and taking "this person to cash a $300 check." She said that she would return to the Sheltons' apartment "as soon as [she] g[o]t done." Time passed and Mr. Shelton again grew concerned and began calling Ms. Thompson's phone with no answer. He decided to drive to Ms. Thompson and Mr. Stewart's apartment and found no one there. He also noticed, contrary to Ms. Shelton's testimony, that Ms. Thompson's BMW was not there.

Mr. Shelton testified that on the morning of March 11, 2012, as he drove Ms. Shelton to work, he noticed Ms. Thompson's apartment was "taped off" with yellow crime tape. After leaving Ms. Shelton at work, Mr. Shelton returned home where his brother told him about news coverage of the murders. Mr. Shelton recalled that law enforcement authorities approached him at a gas station, requesting to speak with him. He complied with their request and was transported "downtown somewhere in Cocke County." He spoke with law enforcement and then rode with law enforcement, directing them to the location of the Hartford trailer.

On cross-examination, Mr. Shelton agreed that in his statement to authorities, he did not identify the gender of the caller on the night of March 10, 2012, as he had during his trial testimony. He further agreed that, in his statement, he said that Ms. Thompson had sold $400 worth of crack cocaine at the Defendant's trailer on March 9, 2012. The following day, when they stopped at "Fred's trailer," Ms. Thompson had $7,000 in cash on her, according to Mr. Shelton's statement to authorities. Mr. Shelton stated that Ms. Thompson kept money in "her panties," and carried an ivory-handled Derringer to protect herself from being robbed. Mr. Shelton clarified that, on the morning of March 11, 2012, when he saw the crime tape around Ms. Thompson's apartment, he believed the apartment had been "raided . . . over drug behavior."

Jeff Caudill, a Greene County Sheriff's Department deputy, testified that he responded to a dispatch early on Sunday morning, March 11, 2012. A report had been made about a person lying face down underneath the "river bridge" on Newport Highway. Deputy Caudill explained that there was a gravel road on the side of Newport

Highway that led about 200 yards down underneath the bridge. Initially, Deputy Caudill did not see anyone in the immediate area around the bridge. As he approached the bridge, he saw a white t-shirt. A male, later identified as Mr. Stewart, wearing a white t-shirt was lying face down. As he approached Mr. Stewart, he saw a female, later identified as Ms. Thompson, lying face up, to the left of Mr. Stewart's body. Deputy Caudill checked both persons to assess injuries and found that both had "obvious gunshot wound[s]" and both were deceased.

Deputy Caudill testified that, based on the position of the bodies, the leaves found in Ms. Thompson's underwear, abrasions, and clothing placed near the victims, it appeared the bodies had "been placed there." Deputy Caudill identified pictures of the bodies as they were found.

Tabitha Whitlock testified that she was incarcerated at the time of trial pending her guilty plea to second degree murder in this case. Ms. Whitlock recalled that she began dating Chris Jones in November 2011. Through Mr. Jones, Ms. Whitlock met Teresa Miller, the Defendant's girlfriend, Ms. Thompson, Mr. Stewart, and the Defendant. She said that, in March 2012, the Defendant lived in Hartford, and she spent several nights at his trailer.

Ms. Whitlock testified that in March 2012, she was addicted to morphine and Xanax and had "injected morphine 200s" and taken "several Xanaxes" that night before getting into Ms. Thompson's blue Honda. Ms. Whitlock was "told" that they were going to the Greeneville Terrace Apartments in Greene County, Tennessee. Ms. Thompson was driving, and Mr. Stewart sat in the front passenger seat. Ms. Whitlock was seated in the backseat, behind Ms. Thompson, with Mr. Jones in the back middle seat, and the Defendant seated behind Mr. Stewart. As they drove, Mr. Stewart, Mr. Jones, and Ms. Whitlock shared a "blunt" while the Defendant and Ms. Thompson talked about "some dealings that had went wrong and some money that she owed him." Ms. Whitlock summarized their conversation, saying that Ms. Thompson had been robbed and that some of the money stolen had been owed to the Defendant. The Defendant wanted the money owed to him and also argued with Ms. Thompson about "some of his clients" that she had "tak[en]."

Ms. Whitlock testified that she was talking to Mr. Stewart when she heard "a real loud bang." Initially she believed a tire had blown out, but as Mr. Jones jumped forward to take hold of the steering wheel, she realized it was a gunshot. She saw the Defendant with a gun she had seen him acquire through a trade "a few days before." She said that she knew the Defendant to always carry a gun. Ms. Whitlock described several gunshots that were "just within a couple of seconds of each other." The Defendant shot Mr. Stewart first and then shot Ms. Thompson within seconds. As she realized what had

happened, Ms. Whitlock began screaming and crying. The Defendant told her "to shut the F up." Once the Honda was stopped, the Defendant and Mr. Jones moved Ms. Thompson into the back seat with Ms. Whitlock. Ms. Whitlock recalled that Ms. Thompson was "still gurgling."

Ms. Whitlock testified that the shooting occurred "[a]t the S curves" in Greene County, past the bridge. Mr. Jones drove the blue Honda back toward the bridge and then underneath the bridge on the access road. As they drove, Ms. Thompson was leaned up against Ms. Whitlock, and Ms. Whitlock could hear "rattling." She characterized the "rattling" as Ms. Thompson "still trying to breathe." The Defendant was also seated in the back seat, instructing Mr. Jones where to drive. When they reached the bottom of an access road underneath the bridge, Mr. Jones and the Defendant began trying to move Mr. Stewart. Because Mr. Stewart was a large man, Ms. Whitlock helped. Ms. Whitlock recalled that when she grabbed Mr. Stewart's feet, his shoes came off in her hands, and she began "freaking out." Eventually, Mr. Jones and the Defendant got Mr. Stewart out of the car, and then they removed Ms. Thompson from the car. They carried Ms. Thompson's body to the front of the car, and then Ms. Whitlock, who was behind the car, heard another gunshot. Ms. Whitlock was unable to see who fired this shot.

Ms. Whitlock testified that she had maintained that the Defendant was in the car in every statement to the police she had given about the night of the offenses. She did at one point, however, tell her attorney that Mr. Jones held the gun and not the Defendant. She explained that she had become fearful of testifying based upon "threats" made through "another inmate." She knew that Mr. Jones had already pleaded guilty, so she changed her story, believing that if she did, she would not have to testify against the Defendant. She maintained that she had lied out of fear and concern for her safety and the safety of her children.

Ms. Whitlock identified photographs of the victims taken at the crime scene. She said that, at the time that they were removing the bodies from the blue Honda, she believed she would be shot next because she had witnessed the shooting. As they left the scene, the Defendant said, "This is what happens to people that rob me, snitch on me or F me over." The Defendant told Mr. Jones that Ms. Whitlock had "better keep [her] mouth shut" and that he knew where Ms. Whitlock lived and also where Ms. Whitlock's children lived.

Ms. Whitlock testified that, after disposing of the bodies, Mr. Jones drove the Honda to the victims' apartment. Ms. Whitlock said there was "blood everywhere" inside the Honda. When they arrived at the apartment, the Defendant and Mr. Jones went through the apartment. Ms. Whitlock said that it appeared they were looking for "something specifically," even emptying cereal boxes during their search. The men took

two guns from the safe and a BMW before driving to Mr. Jones's father's trailer. Mr. Jones drove the Honda, and Ms. Whitlock drove the BMW with the Defendant riding with her.

Ms. Whitlock testified that, at the trailer, she and Mr. Jones "wiped down" the Honda with white socks and bleach while the Defendant stood by watching and "giving orders." She recalled that the Defendant was frustrated with her because she continued to cry as she cleaned the car. They covered up some of the remaining blood stains with blankets taken from Ms. Thompson and Mr. Stewart's apartment. Mr. Jones then drove the blue Honda to a Perkins restaurant while Ms. Whitlock and the Defendant followed in the BMW. They left the Honda in the Perkins restaurant parking lot and then drove to Blue Ridge Apartments near Mr. Jones's father's residence where they left the BMW. She confirmed that no one had given them permission to take the BMW or the Honda.

Ms. Whitlock testified that, after leaving the BMW, they went to Mr. Jones's house. When they arrived, she went in the bathroom to take more drugs in an attempt to "numb" herself while the Defendant and Mr. Jones were outside talking. She observed the Defendant giving Mr. Jones "some pills," money, and a white Derringer. Ms. Whitlock recalled that when they were transferring the bodies to the area near the bridge, she saw the Defendant take "a wad of cash" and "some pills" from Ms. Thompson's body.

On cross-examination, Ms. Whitlock agreed that she and Mr. Jones had spent a few nights a week at the Defendant's residence. She denied participation in the robbery and shooting of the victims but stated that she should have notified police directly. She explained that she did not notify police because she was "in shock" and feared for her life. Ms. Whitlock confirmed that she had an agreement to plead guilty with the State that would require her to serve sixteen years. Ms. Whitlock maintained that, when she entered the blue Honda, she was unaware of any plan to rob Ms. Thompson and Mr. Stewart. Ms. Whitlock agreed that she was "[a] little bit" afraid of Mr. Jones. She said that Mr. Jones had held a gun to her head one time and that he could "[s]ometimes" become violent when he was high. She denied, however, any fear of Mr. Jones influencing her testimony.

Dr. Karen Cline-Parhamovich testified as an expert witness in the field of forensic pathology. Dr. Cline-Parhamovich conducted the autopsies in this case. She testified that Mr. Stewart had been shot two times in the head from an indeterminate range of fire. Dr. Cline-Parhamovich recovered a "yellow jacketed bullet" from "the soft tissue of the upper cervical spinal region." Another bullet entered Mr. Stewart's right ear and lodged into a thick bone in the inner ear area. Based upon her examination, she estimated that the gun was fired from twelve to twenty-four inches away from the victim. In addition to

- 7 -

the gunshot wounds, Mr. Stewart sustained minor superficial scrapes and bruising to his body. She confirmed that the toxicology report indicated the presence of a cocaine metabolite and oxycodone in Mr. Stewart's blood at the time of death. Dr. Cline-Parhamovich testified that Mr. Stewart died of multiple gunshot wounds to the head and the manner of death was homicide.

Dr. Cline-Parhamovich next testified about her examination of Ms. Thompson's body. In examining the exterior of the body, Dr. Cline-Parhamovich found a baggy of "white crystalline substance" in Ms. Thompson's right armpit. Ms. Thompson sustained four gunshot wounds to her head. Dr. Cline-Parhamovich recovered bullets and bullet fragments from Ms. Thompson's head. The toxicology report indicated the presence of oxycodone in Ms. Thompson's blood. Dr. Cline-Parhamovich testified that Ms. Thompson died of multiple gunshot wounds to the head and the manner of death was homicide.

Mike Fincher, a Greene County Sheriff's Department lieutenant, testified that in March 2012, he was a detective sergeant in the criminal investigation division. As such, he became involved in the investigation of the death of Ms. Thompson and Mr. Stewart. Lieutenant Fincher reported to an area under the bridge off of Newport Highway. Initially, none of the officers at the scene were able to identify the victims. As other officers arrived, a sheriff's deputy identified the bodies as Ms. Thompson and Mr. Stewart, and the families were notified. Lieutenant Fincher identified photographs of the crime scene, confirming that the photographs depicted what he saw upon his arrival: Ms. Thompson with her shirt pulled up and her pants missing; Mr. Stewart lying on his stomach with his shoes on the ground next to him; and a large blood stain on the back of Mr. Stewart's shirt.

Lieutenant Fincher testified that, after identifying the bodies, he drove to the Thompson residence and spoke with Ms. Thompson's parents. Based upon information gathered from Ms. Thompson's parents, Lieutenant Fincher next drove to Newport to apartment 14 at "Uptown Rentals" where Ms. Thompson and Mr. Stewart had rented a unit. The door was locked when he arrived, so he contacted a manger to unlock the door. When he entered, he found the residence had been ransacked with items strewn about the apartment.

Lieutenant Fincher testified that he next responded to an area off of Jimtown Road based upon information gathered by the Cocke County Sheriff's Department. At this location Lieutenant Fincher found items associated with the victims. He explained that in this area there was a guardrail with a steep cliff covered with trees and vegetation. He described the terrain in this area as "rough." Based upon the location of the various items, it appeared the items had "been flung out and scattered on the cliff there beside"

the road. Lieutenant Fisher called the location a "dump site" "where people throw garbage and trash." Among the items found were cards with the victims' names, an automotive headrest cover, an aviator hat, a seat cover with reddish-brown stains, and different types of paperwork. One of the items was a Tennessee vehicle registration showing Ms. Thompson as the owner of a 1997 four-door Honda. Several other documents were recovered including a learner's permit belonging to Ms. Thompson and a photocopy of Mr. Stewart's Tennessee Driver License.

Lieutenant Fincher testified that the following day, Monday, March 12, 2012, he drove to Blue Ridge Apartments based upon information that a BMW registered to Ms. Thompson had been found. Lieutenant Fincher did not enter the car but observed a red T-shirt on the floorboard and a Tinker Bell floor mat. He further noted that the car stereo had been "ripped out" of the BMW. The BMW was transported to the Tennessee Bureau of Investigation ("TBI") Crime Lab for processing. Lieutenant Fincher returned to the Jimtown Road area and found reddish-brown stains on a tree next to the road and collected a sample of the stain with a swab. The swabs were delivered to the TBI for analysis.

Lieutenant Fincher testified that on the evening of March 14, 2012, he conducted a traffic stop in Newport off of Messer Road. The Defendant, who was a passenger in the vehicle, was taken to the Cocke County Sheriff's Department and interviewed. Lieutenant Fincher recalled that the Defendant was read the *Miranda* warnings and then he signed a Waiver of Rights. The Defendant spoke with law enforcement, and a TBI agent wrote out the statement for the Defendant who then dated and signed the document. Lieutenant Fincher read the following statement aloud:

> I have known [Mr. Stewart] for about 6 months. I met [Ms. Thompson] about the same time. I bought crack from them. A friend of mine introduced us. I am not a daily user. I would just buy it when I have money. I am a user not a saler [sic]. They would come to my trailer usually. They stayed at our place for a couple of weeks. They would stay 3 or 4 days and leave and then come back. The last time they stayed was a week and a half ago or so. They moved into an apartment at Uptown. I believe it was apartment 14. Friday night was the last time I seen them. Me, Teresa, Chris Jones, and [Ms. Whitlock] (Chris's girlfriend) went to the apt. Friday nite [sic]. [Ms. Whitlock] and [Mr. Jones] went into the apartment to get something to smoke on. [Ms. Whitlock] and [Mr. Jones] had been staying with us. We went home. Teresa started fussing about [Ms. Whitlock]. [Ms. Whitlock] and [Mr. Jones] ended up leaving early Saturday morning. They had a 4-Runner but wrecked it. Someone come [sic] and got them. I just bought a black Honda 3 or 4 days before. That

was what we drove to [Mr. Stewart] and [Ms. Thompson]'s Friday. I paid Sheila Black $1,000 for it. Friday night was the last time we saw or talked to [Mr. Stewart] or [Ms. Thompson]. I tried to call them a couple times Saturday or Sunday but couldn't reach them. (714-    ). Sunday, Teresa's daughter Keasha told us [Mr. Stewart] and [Ms. Thompson] were dead. I saw [Mr. Jones] either Sunday or Monday. I saw him at Jimmy Jones. We went to Keasha's first. We then went to Jimmy Don's (Jones). [Ms. Whitlock] was pulling it up on her phone. Keasha was saying it was [Mr. Stewart] and [Ms. Thompson]. When [Ms. Whitlock] pulled it up they said unidentified, it didn't say [Ms. Thompson] and [Mr. Stewart].

[Ms. Whitlock] always had money. She kept control and didn't let [Mr. Stewart] have any. Friday nite [sic] [Ms. Whitlock] had said something about dropping something off. [Ms. Thompson] had a little .25 derringer (pearl handle). I have never seen [Mr. Stewart] with a gun. I believe they were driving a maroon or red Honda. She had just bought it. It was night when I seen [sic] it. [Mr. Jones] and [Ms. Whitlock] hadn't really said much about [Ms. Thompson] and [Mr. Jones]'s deaths. They just knew them through us and didn't know them as well as us.

[Mr. Stewart] was smoking crack every time [Ms. Thompson] would give it to him. She was getting bad on pills (roxys).

I talked to [Mr. Jones] yesterday on the phone. He called Dad's house. He was wanting work done on a 4-Runner. [Ms. Whitlock] bought a black 4-Runner from [Ms. Thompson]. She got income tax money. She bought it around 3 weeks or a month ago. They put it in Chris's Mom's name (Pam Jones) because they were afraid it was hot. [Mr. Jones] is skinny, messed up eye, dark brown or black hair. He has tattoos all over him. He is kind of tall.

On Sunday we picked up [Mr. Jones] and [Ms. Whitlock] at Buck's house ([Mr. Jones]'s house) near City Park. We were in the black Honda. [Mr. Jones] stayed at the house, he said he had a warrant. [Ms. Whitlock] ended up buying $300 of fake dope at Crystals [sic]. Keasha's boyfriend had set it up. It was a white boy named Steve. [Mr. Jones] had given me the $300. He owed $100. I was going to get $200 worth but [Ms. Whitlock] pulled out another $100 and said get $300. [Ms. Whitlock] and [Mr. Jones] said they were leaving for Knoxville. Somebody was supposed to pick them up.

- 10 -

[Mr. Jones] does not work anywhere. The 4-Runner was going to Jimmy Don's to get worked on. Yesterday he ([Mr. Jones]) was also wanting to come stay a night or two at Dad's. We are getting kicked out of the [Hartford] trailer on Tobacco Way. [Mr. Jones] was trying to sale [sic] a gun Sunday night. It was a .38 stub nose revolver with a wooden handle. He was asking $150 for it. I have seen him with a little .22 pistol. He said he sold it and got the .38. I don't know if he sold it or not.

[Ms. Whitlock]'s people are from Greeneville. She and [Mr. Jones] go to Greeneville. [Ms. Whitlock] has a son I believe in Greeneville.

Saturday – I was at Dad's place. He wanted pills. He gave me $150. I went and got him Roxy's. [Ms. Miller] was with me. I went to White Pine, Newport and Morristown. It was in the evening when we go[t] back, probably around 5:30/6:00. We came back in town and went shopping. We went to Sav-A-lot and IGA. We used my food stamp cards. Went back to Dad's. I think we had chicken or hot dogs. We then went to the trailer on Tobacco Way. We drank some beer. We watched some recorded movies and went to bed.

It may have been Saturday night that we went to [Ms. Thompson]'s. I had taken some hits of crack and drank beer. I am an alcoholic. I drink every day. I think the old lady may have been upset over [Ms. Whitlock]. I think I took a hit and took it [to Ms. Miller] to take a hit. We went to bed. This was probably 1:30 a.m./2:00 a.m. Saturday night/Sunday morning. I don't know if [Mr. Jones] and [Ms. Whitlock] called [Ms. Thompson] and [Mr. Stewart] to come up with some more crack. I get the days confused. I don't know if it was Friday or Saturday.

I parked my black Honda at my great-aunt's, Maddy Hall. She lives on the main road in Hartford past Dads [sic]. Dad said the police were at the house looking for me and people said the police were looking for a black Honda. I got scared and paranoid and hid it.

I am a heavy sleeper. I don't wake up. I don't know if [Mr. Stewart] and [Ms. Thompson] came back to the trailer or not. [Mr. Jones] and [Ms. Whitlock] took me to a black house on Jimtown Rd. before to get crack. [Mr. Jones] and [Ms. Whitlock] are on that crack bad.

[Mr. Jones]'s mom lives up on black mountain somewhere. Either Friday or Saturday when I saw Courtney she showed me a wad of cash and a

- 11 -

Derringer, it was loaded. She put the wad of cash - - she pulled the wad of cash from her bra. She said it was over 4,000. Me, [Mr. Jones], [Ms. Whitlock], and Teresa saw it. This was when she came to the [Hartford] trailer on Tobacco Way.

I think she had a hoodie on. I don't remember much about her clothes. I think [Mr. Stewart] had on Jordan shoes.

Lieutenant Fincher confirmed that the statement was an accurate reflection of what the Defendant told law enforcement during the interview.

Lieutenant Fincher testified that, two days after taking the Defendant's statement, on March 16, 2010, he drove to Sevier County where he believed Mr. Jones and Ms. Whitlock were hiding. After the couple was apprehended and transported back to Cocke County, Lieutenant Fincher interviewed Ms. Whitlock. Based upon Ms. Whitlock's statements, Lieutenant Fincher interviewed the Defendant again. Lieutenant Fincher advised the Defendant of his rights, and the Defendant signed a Waiver of Rights form, confirming his willingness to talk with authorities. Lieutenant Fincher read the second statement aloud as follows:

Friday night I got with Todd Olden to buy some crack. I got a .22 pistol from Chris Jones. I traded the .22 for a .38 pistol, it was black with kind of an orange wooden handle. I gave [Mr. Jones] the [.38] on Friday night, the same day that I had traded for the .22 pistol. Buck Jones saw me with the [.38] on Sunday evening at his house. My dad has the [gun]. It's under a rock at his (my dad) house where I had been staying. My dad's phone number is [ ]. Dad had a box of .38 shells. I put the shells out for [Mr. Jones] on the coffee [table]. My dad hid [the gun] because he was scared. My girlfriend Teresa [Miller] had the [gun] hid. I had 3 or 4 four hundred on me on Sunday. I make maybe a thousand a month. Me and [Ms. Thompson] dealt in pills some. I gave [Ms. Thompson] a little .25 silver with pearl handles. I gave he[r] the pistol to protect herself because she is a good girl. [Mr. Jones] and [Ms. Whitlock] took me to Greeneville before to get pills, one time, but we [got] ripped off. We [went] to a little store by the projects. I think it was the Little Orange Market. I let 500 walk. It's been about five months ago. Me, [Ms. Whitlock] and [Ms. Miller] got ripped off on some crack at Krystal the other day[.] [I]t was Friday or Saturday. It was the Krystal's in Newport. [Ms. Thompson] was not at my place on Friday. [Mr. Jones] and [Ms. Whitlock] left on Saturday morning because [Ms. Miller] and [Ms. Whitlock] kind of got into it. The black Honda was the only thing we have been driving. I was with [Ms.

- 12 -

Miller] all night on Saturday night. My fingerprint will never show up in [the blue] Honda that belongs to [Ms. Thompson]. I have had my truck at Buck's. I would say that [Ms. Whitlock] was probably with them. I told Buck I was going to get that [gun] from [Mr. Jones] but Buck said they was in Gatlinburg. I said let me get the [gun] cause I going to sell the [gun]. I have never been in the Honda and my DNA will not be in there. The .38 caliber I just saw was the pistol I got from Todd Olden.

Lieutenant Fincher confirmed that the statement accurately reflected the Defendant's second statement.

On cross-examination, Lieutenant Fincher agreed that he had not recorded his interview with the Defendant, explaining that it was his "common practice" to write out a defendant's statement. On redirect examination, Lieutenant Fincher confirmed that, in his statement, the Defendant had said that his father had told him that the police were looking for him and that he decided to hide his car. On recross examination, Lieutenant Fincher testified that the Defendant's father brought the .38 pistol to the Cocke County Courthouse at the Defendant's request. Both the Defendant and Mr. Jones identified the .38 pistol, which was later forensically identified as the murder weapon.

Buck Jones[1], Mr. Jones's father, testified that he knew Ms. Whitlock through his son and had met Ms. Thompson on one occasion. He said that he did not know Mr. Stewart, but had worked with Mr. Stewart's father for approximately forty years. He recalled Saturday, March 10, 2012, saying that he was driving to a birthday party in Knoxville, Tennessee when his son, Mr. Jones, called asking for permission to enter his trailer ("Meeks Way trailer"). Mr. Buck Jones returned from Knoxville on Sunday afternoon, arriving in Newport at around 5:00 p.m. Before going home, he went to Jim Bible's home to have Mr. Bible check his car for a leak.

Mr. Buck Jones testified that, while at Mr. Bible's house, the Defendant and Ms. Miller drove up in a black Honda. Mr. Buck Jones asked the Defendant about the Honda, and the Defendant told him that he had bought the black Honda the night before for $1000. The Defendant then inquired about Mr. Jones and whether the Defendant could go see him at Mr. Buck Jones' trailer. Mr. Buck Jones consented, and the Defendant said that he would go to the Meeks Way trailer after having a beer and smoking. Mr. Buck Jones went home and found Mr. Jones and Ms. Whitlock watching television. When Mr. Buck Jones mentioned that he saw the Defendant and that the Defendant wanted to speak with Mr. Jones, Mr. Jones said he did not want to talk to the Defendant.

---

[1] Because one of the co-defendant's and this witness share a surname, we will reference this witness by his full name to distinguish between the two witnesses.

Mr. Buck Jones testified that the Defendant and Ms. Miller arrived approximately twenty minutes later. Mr. Buck Jones was outside working on his car, and the Defendant and Ms. Miller went inside the trailer. When Mr. Buck Jones went inside to fill a "jug" with water, they were all seated in the living room. Approximately ten minutes later, the Defendant and Ms. Miller exited the trailer. The Defendant approached Mr. Buck Jones and pulled a pistol, later identified as the murder weapon, from his waistband. The Defendant stated that he "also bought this last night." Mr. Buck Jones told the Defendant to put the pistol in his car, and the Defendant responded that he was leaving. Mr. Buck Jones testified that the Defendant did not indicate from whom he had bought the pistol. He confirmed that he did not see Mr. Jones with the pistol the Defendant had shown him prior to the Defendant's arrival.

Mr. Buck Jones testified that he left after the Defendant showed him a black pistol with brownish orange handles and returned to the trailer at approximately 8:30 p.m. When he returned Mr. Jones and Ms. Whitlock were not there. He did not hear from his son again until Tuesday or Wednesday when Mr. Jones called and asked "if anybody had been there." On Thursday, law enforcement authorities contacted Mr. Buck Jones. He confirmed that he had cooperated with law enforcement's investigation.

On cross-examination, Mr. Buck Jones testified that he provided the police with a statement. He denied that Mr. Jones had made any statements to him about the murders. He further denied that he called the Defendant asking to buy the gun the Defendant had shown him. Mr. Buck Jones stated that he had seen Mr. Jones while under the influence of drugs but that he had never seen Mr. Jones act in a violent manner.

Jaron Shetley testified that he was a recovering drug addict and currently serving a five-year sentence for drug-related offenses. Mr. Shetley said that he knew the Defendant through Ms. Miller. He had been at the Defendant's residence when Ms. Thompson and Mr. Stewart were present and stated that Ms. Thompson was a known drug dealer. Mr. Shetley recalled that on Sunday, March 11, 2012, the Defendant came to Mr. Shetley's home with Ms. Whitlock and Ms. Miller. Ms. Miller asked Mr. Shetley if he would buy some crack cocaine for her, and he "made a phone call," but was unsuccessful.

Mr. Shetley testified that he stepped outside to place a few more phone calls and during one of the phone conversations, he learned about the murders. He went back inside and told Ms. Miller, Ms. Whitlock, and the Defendant about the murders. He recalled that Ms. Miller began crying hysterically, the Defendant "just looked like, damn," and Ms. Whitlock said, "that sucks" in response to the news. Mr. Shetley left to find the requested crack cocaine, but he decided to sell the Defendant "B.C. powder"

- 14 -

instead. He met the Defendant in a Krystal's parking lot and exchanged $300 for the "fake product." He said that he saw a pistol in the Defendant's lap while the Defendant was seated in the car in the Krystal's parking lot.

Mr. Shetley testified that, two days later, the Defendant and Ms. Miller came to his home unannounced. The Defendant entered carrying the same pistol Mr. Shetley had previously seen. About the "fake product," the Defendant told Mr. Shetley he needed "to get this right." Mr. Shetley told the Defendant he would try to "get ahold of somebody and try to make this right." Mr. Shetley asked to see the pistol, later identified as a .38, and the Defendant handed it to him. Mr. Shetley said to the Defendant, "man, I bet this thing talks." The Defendant replied, "yeah, I have made it talk." Before handing the pistol back to the Defendant, Mr. Shetley wiped his prints off of the pistol. The State showed Mr. Shetley a photograph of the pistol associated with the murders, and Mr. Shetley confirmed that it looked like the gun he had seen the Defendant with on both occasions.

Chris Jones testified that he had pleaded guilty to the murders of Ms. Thompson and Mr. Stewart and received a thirty-five-year sentence. Mr. Jones acknowledged that he had other convictions for theft and robbery unrelated to this offense. Mr. Jones testified that he spent Friday night, March 9, 2012, at Wade Roberts's house on Messer Branch Road. Wade Roberts is the Defendant's father. Mr. Jones awakened the next morning by the sound of Ms. Thompson walking around the living room. She asked Mr. Jones to help her find her "dope" and her "money." He helped her look for a few minutes, and when they were unable to find the items, Ms. Thompson, Mr. Stewart, Ms. Whitlock, and Mr. Jones drove to the Defendant's trailer looking for him. Mr. Jones testified that the Defendant and Ms. Miller had also been at Mr. Roberts's house the night before, but they were not there when he woke up. When they arrived at the Defendant's trailer, no one was there so they returned to Mr. Roberts's house.

Mr. Jones testified that Ms. Thompson called him back to one of the bedrooms and asked Mr. Jones to promise her that he had not taken her money. He assured her that he had not and Ms. Thompson asked, "ain't you tired of living here[?]" Mr. Jones explained to the jury that he had been staying at Mr. Roberts's home for three weeks to a month and that there had been "a lot of arguing going on." Because of this, he told her that he was tired of living there. The two then came up with a plan. Mr. Jones called Mr. Stewart back to the bedroom and told him to get Mr. Roberts out of the house. Mr. Stewart asked Mr. Roberts for some tools under the pretense that he was going to work on Mr. Jones's black 4Runner. While Mr. Roberts walked to a "little building outside" to retrieve tools, Ms. Thompson and Mr. Jones took between $4,000 and $5,000 from Mr. Roberts's top dresser drawer. Mr. Jones testified that he kept $1,000 of the money taken from Mr. Roberts and hid it inside his shoe.

Mr. Jones testified that when Mr. Roberts and Mr. Stewart returned, they told Mr. Roberts they were going to work on the 4Runner, put the tools in Ms. Thompson's Honda, and began pulling out of the driveway. As they did, the Defendant and Ms. Miller drove up in the white 4Runner. Ms. Thompson confronted the Defendant about the missing money and crack cocaine, and the Defendant denied taking the money or drugs. The Defendant then changed the subject, asking whether Ms. Thompson could acquire some "pills" for him. Ms. Thompson told him no and they left, driving to the Defendant's trailer to pack up Mr. Jones's and Ms. Whitlock's clothing. Mr. Jones said that he wanted to take his belongings from the Defendant's trailer because he knew when Mr. Roberts and the Defendant found the money missing "there was going to be a bad deal."

Mr. Jones testified that, shortly after they arrived at the trailer, the Defendant and Ms. Miller arrived and parked behind the blue Honda. The Defendant told Ms. Thompson she was going to take him to "get some pills." Ms. Miller left in the white 4Runner, and the Defendant, Ms. Thompson, Mr. Stewart, Ms. Whitlock, and Mr. Jones drove in Ms. Thompson's blue Honda to Newport. Mr. Jones recalled that Ms. Thompson drove and Mr. Stewart sat in the passenger seat. In the back row, Ms. Whitlock sat behind the driver's seat, Mr. Jones sat in the middle seat, and the Defendant sat in the seat behind the passenger's seat. When they arrived at Fred Green's trailer, Ms. Thompson took money from the Defendant, went into the trailer for ten minutes, and then returned with "Roxy 30s." She gave the Defendant the pills and "some left-over money." The Defendant told Ms. Thompson, "that's not even close to how many I need." Ms. Thompson responded that she had other things she needed to do and that she was going to take him home.

Mr. Jones testified that Ms. Thompson drove back to the Defendant's trailer. Mr. Jones went inside the trailer, and when he came back out, Ms. Thompson and Mr. Stewart were driving away. Seeing the blue Honda drive away caused Mr. Jones concern because he would now be "stuck" at the Defendant's trailer if Mr. Roberts discovered his money was missing. The Defendant gave Mr. Jones the bag of tools borrowed from Mr. Roberts and told him to work on his black 4Runner. The Defendant told him that Ms. Thompson would be back later.

Mr. Jones testified that he continued packing his belongings and while doing so, he heard the Defendant's phone ringing and then the Defendant asking the caller, "Was it the top drawer or the bottom drawer[?]" The Defendant concluded his phone call and then called Mr. Jones into the living room. In the living room, the Defendant asked Mr. Jones if he had seen anyone enter Mr. Roberts's bedroom, and Mr. Jones lied, saying he had not. The Defendant then asked if anyone had taken money from the dresser drawer,

and again Mr. Jones denied any knowledge of someone stealing from Mr. Roberts. Mr. Jones described the Defendant as "mad," and the Defendant told Mr. Jones and Ms. Whitlock that Ms. Thompson was the only person who knew the money was in Mr. Roberts's top dresser drawer. The Defendant remembered that Ms. Thompson had seen him retrieve money from the dresser drawer two or three days before when he bought crack cocaine from her.

Mr. Jones testified that the Defendant told him, "if [Ms. Thompson]'s going to rob, I need to rob her too." The men then began talking about a robbery of Ms. Thompson. The Defendant proposed that they attempt to get Ms. Thompson and Mr. Stewart "to a road somewhere and get them out of their car and just check their clothes because [Ms. Thompson] will have money on her." The Defendant suggested carrying guns. Mr. Jones agreed but suggested that the guns not be loaded. At this suggestion, the Defendant laughed and said, "we're not robbing gas stations with B.B. guns." The Defendant noted Mr. Stewart's large size and insisted, "we're going to make sure that we don't get our stuff took while we're in the process of taking their stuff." The Defendant showed Mr. Jones the .38 pistol that he traded for with Todd Olden. The Defendant told Mr. Jones that if he would help the Defendant rob Ms. Thompson, the Defendant would give him $500 and ten "Roxies." Mr. Jones testified that he agreed to assist the Defendant in the robbery. Ms. Whitlock, who was seated on the couch with the men, heard the men's discussion but did not participate in the conversation.

Mr. Jones testified that he told the Defendant that he and Ms. Whitlock had to go to Walmart to buy birthday presents for Ms. Whitlock's son. The Defendant went with them to Wal-Mart and then to Mr. Buck Jones's residence. Mr. Jones said his father was out of town, so he called Mr. Buck Jones and asked if he could spend the night there. Mr. Buck Jones agreed, and Mr. Jones, Ms. Whitlock, and the Defendant went inside. Once inside, they repeatedly called Ms. Thompson's cell phone and passed the time by using drugs and watching a movie. Mr. Jones and the Defendant decided that they would induce Ms. Thompson to come get them by telling her that Mr. Jones had "a check from Knoxville" that he had left in his mother's van in Greeneville. Mr. Jones planned to tell Ms. Thompson that if she would drive him to Greeneville to get the check, he would give her the $60 he owed her, and he would buy $300 worth of crack cocaine from her. Additionally, they would tell her that, while in Greeneville, the Defendant intended to buy pills from someone at "Terrace Apartments."

Mr. Jones testified that he called Ms. Thompson for "four hours straight" before he finally spoke with her. He told her about the "check" and asked if she would drive him to retrieve it. He said Ms. Thompson seemed confused at first and then asked if the Defendant was with him. Mr. Jones confirmed that he was, and Ms. Thompson agreed to drive him to Greeneville. When Ms. Thompson did not come to the trailer, Mr. Jones

repeatedly called Ms. Thompson until 11:00 or 11:30 p.m. with no answer. The Defendant, Mr. Jones, and Ms. Whitlock continued using drugs and watching movies until Mr. Jones heard a car outside. He went outside the trailer and saw Mr. Stewart and Ms. Thompson walking up. Mr. Jones bought $50 worth of crack cocaine from Ms. Thompson, and he shared it with everyone but Ms. Thompson, who was "crushing up pills." Mr. Jones stated that Ms. Thompson appeared to still be angry about her missing money and drugs from that morning. The Defendant asked her to go back to the bathroom with him, and she did. While they were in the bathroom, Ms. Miller arrived and asked for the Defendant. Mr. Stewart told her he was in the bathroom with Ms. Thompson.

Mr. Jones testified that when Ms. Thompson exited the bathroom with the Defendant her face was red and she did not appear to be in a good mood. He guessed she had either been crying or that they had been arguing. Ms. Miller asked the Defendant if he had talked to Ms. Thompson about Mr. Roberts's missing money, and the Defendant responded by asking Ms. Miller to talk with him outside. After the Defendant and Ms. Miller went outside, Ms. Thompson told Mr. Jones that they needed to leave for Greeneville because it was getting late. Mr. Jones estimated that it was around midnight at the time. Ms. Thompson drove, Mr. Stewart sat in the front passenger seat, Ms. Whitlock sat in the back seat behind Ms. Thompson, Mr. Jones sat in the middle back seat, and the Defendant sat in the back seat behind Mr. Stewart. As they pulled away from the trailer, the Defendant's cell phone rang, and he answered it. Mr. Jones heard the Defendant say, "yes, daddy, I'm taking care of it" and "I'll see you in a little while." They drove a short distance to "Debbie and Hawk's" house with Ms. Miller following. While outside the residence, they all shared a "blunt" except for the Defendant. The Defendant gave his cell phone to Ms. Miller, who left in the white 4Runner, and they began the drive to Greeneville.

Mr. Jones testified that, as they drove, the Defendant and Ms. Thompson began to argue, and the Defendant called Ms. Thompson, "Bitch." Mr. Stewart took offense to the reference and responded to the Defendant. The Defendant then said, "so, you all expect me to let you all steal off me, rob my daddy and then you're going to put me out to walk. You must think I'm some kind of whore." Mr. Stewart then "made a movement," and the Defendant picked up the gun from his lap and fired it at Mr. Stewart. Mr. Jones looked down and saw that he was covered in blood. Ms. Thompson turned in reaction to the gunfire as the car began "jerking" "like she threw the car up in park," and the Defendant fired the gun at Ms. Thompson. Ms. Thompson's head hit the driver's side window, and the car came to a stop. Mr. Jones said that Ms. Whitlock screamed, the Defendant told her to "shut up," and then he ordered Mr. Jones to get out of the car. The Defendant also got out of the car, and he fired the gun at Mr. Stewart again through the partially opened window.

- 18 -

Mr. Jones testified that the Defendant told him to help move Ms. Thompson. After they moved Ms. Thompson to the back seat, the Defendant told Mr. Jones to drive, and the Defendant got back into seat behind Mr. Stewart. Mr. Jones said that he began to drive toward Newport when the Defendant instructed that he drive toward Greeneville. As soon as Mr. Jones began driving toward Greeneville, he heard another gunshot, and Ms. Whitlock said, "[H]e shot her again." Mr. Jones recalled that Ms. Thompson had been making "gurgling sounds." He said that it "[s]ounded like she was trying to talk, she was trying to breathe." Mr. Jones recalled that Ms. Thompson's cell phone was ringing repeatedly, so the Defendant instructed him to pull the car over. Mr. Jones complied, pulling the blue Honda to the side of the road near a white "Welcome to Greeneville" sign. The Defendant threw the cell phone out and then told Mr. Jones to drive toward Greeneville.

Mr. Jones testified that he drove on a gravel road that led under a bridge. The Defendant got out of the car and told Mr. Jones to help him get Mr. Stewart out of the car. As they tried to move Mr. Stewart, Mr. Jones felt ill and "went over to the weeds to get sick." Ms. Whitlock moved to the front seat and pushed Mr. Stewart with her feet while the Defendant pulled Mr. Stewart out of the Honda. Mr. Jones confirmed that Mr. Stewart's shoes were removed to "check[ ] for drugs or money." The Defendant asked Mr. Jones if he thought he could now help him get Ms. Thompson out of the car. The Defendant grabbed Ms. Thompson's feet, and Mr. Jones grabbed her arms. When the two men began to lift her body, Mr. Jones let go of Ms. Thompson, and the Defendant cursed at Mr. Jones, saying that Mr. Jones could not do anything right. The men tried again and carried Ms. Thompson to a sandy area. The Defendant retrieved a "roll" of money from Ms. Thompson's underwear and then handed Mr. Jones the .38 pistol. He told Mr. Jones that there was a bullet or two left in the pistol and to shoot Ms. Thompson again even though she was already dead. The Defendant reasoned that this ensured Mr. Jones's participation and, therefore, Mr. Jones would be unable to get the Defendant "in trouble." Mr. Jones fired the pistol at Ms. Thompson's body.

Mr. Jones testified that after he fired the pistol, the Defendant retrieved pills from Ms. Thompson's bra. The Defendant then took bed sheets from the trunk of the car and laid the sheets over the blood-covered seats in the car. The Defendant, who sat in the back seat, told Ms. Whitlock to drive, and Mr. Jones rode in the front passenger seat. They drove to Jimtown Road where they threw out "some IDs" and "other stuff." The Defendant then gave Mr. Jones $500 and ten "Roxies" as he had promised. Mr. Jones identified photographs of the area where they dumped the victims' belongings. He identified a photograph of the aviator hat Ms. Thompson had worn at the time she was shot. After disposing of the victims' property, they drove to Todd Olden's residence. At Mr. Olden's, the Defendant bought $500 worth of crack cocaine and told Mr. Olden that

"he don't think nobody has to worry about [Ms. Thompson] snitching anymore." Mr. Jones estimated that it was around 4:00 a.m.

Mr. Jones testified that next they drove to Powerline Hill where they cleaned out the car. He said they hid a speaker and amplifier from Ms. Thompson's Honda that the Defendant wanted to put in another Honda that he intended to buy. They also disposed of a bloodied "hoodie" the Defendant wore the night of the shootings. They remained there for approximately twenty minutes using bleach to wipe down the Honda and then walked down to the Meeks Way trailer. At the trailer, Ms. Whitlock and Mr. Jones showered and changed. The Defendant changed his clothing, borrowing a pair of pants from Mr. Jones. They all placed their bloodied clothing in a bag and then used drugs. After an hour or two, they walked back to where they had left Ms. Thompson's blue Honda on Powerline Hill and drove to Ms. Thompson and Mr. Stewart's apartment. Ms. Miller met them at the apartment complex and returned the Defendant's cell phone to him. Ms. Miller was to remain in the parking lot to notify them if someone "pulled in."

Mr. Jones testified that they used Ms. Thompson's key to enter the apartment. They were looking for the rest of the money she had taken from Mr. Roberts and "some crack." Mr. Jones recalled that he pretended to help the Defendant look for the money, knowing that he still had some of the stolen money in his shoe. As they looked around, they found two safes that they broke open. Mr. Jones broke open one of the safes and found a Derringer. The Defendant broke open the other safe and found a black .380 with a holster. The Defendant took some jewelry from the bathroom, and the two men took sheets and blankets from the apartment and the guns. Mr. Jones explained that they took the blankets and sheets to cover the blood-soaked seats in Ms. Thompson's Honda. The Defendant gave the keys to the blue Honda to Mr. Jones while he rode with Ms. Whitlock in Ms. Thompson's BMW that was parked outside the apartment.

Mr. Jones testified that the Defendant instructed him to drive Ms. Thompson's Honda to a Perkins restaurant because there were no surveillance cameras in the parking lot. The Defendant, Mr. Jones, and Ms. Whitlock, "cover[ed] everything up," locked the doors of the Honda, and drove away in the BMW. At this point, Mr. Jones was having a reaction to the "drug bath salt," and the Defendant became concerned that Mr. Jones would "get [them] in trouble," so they left Mr. Jones at the Meeks Way trailer. Ms. Whitlock and the Defendant left in Ms. Thompson's BMW and returned fifteen to thirty minutes later with Ms. Miller in the white 4Runner. Ms. Whitlock told Mr. Jones that they had left the BMW at the Blue Ridge Apartments. For the next hour, they smoked crack cocaine. While at the trailer, the Defendant told Mr. Jones that "he had done [Ms. Thompson] and them good and they had done him wrong." He told Mr. Jones not to "worry about what happened to [the victims], sometimes that happens." While at the

trailer, Mr. Jones also overheard Ms. Miller ask the Defendant "did he get the money?" The Defendant confirmed that he did and said "it didn't go as planned."

Mr. Jones testified that they returned to Powerline Hill in the white 4Runner to retrieve the hidden speaker and amplifier taken from Ms. Thompson's Honda. Next, they drove to the Defendant's nephew's trailer where they stored the items before returning to the Meeks Way trailer. Back at the trailer, the Defendant took out "the big bag" of crack cocaine he had purchased from Todd Olden. The Defendant, Ms. Miller, Ms. Whitlock, and Mr. Jones spent the next three or four hours smoking the crack cocaine before the Defendant announced that "he was going to go holler at Todd again real quick." The Defendant returned Ms. Whitlock's and Mr. Jones's phones to them before leaving with Ms. Miller in the white 4Runner. Several hours later they returned in a black Honda. The Defendant knocked on the door of the trailer, and Mr. Jones intercepted Ms. Whitlock's attempt to answer the door. He told her:

> Look, we have done got what we're getting, he's not going to give us nothing else. Teresa Miller has already been talking to him about that we're going to end up telling on him and putting stuff in his head and he's still got a gun on him. I [don't] want to go riding nowhere else with him, I [don't] even want him to be around me no more.

Ms. Whitlock complied, and the Defendant left.

Mr. Jones testified that approximately thirty minutes later, Mr. Buck Jones arrived and mentioned the Defendant. Mr. Jones told his father that he owed the Defendant money and that he did not want to see him. Mr. Jones admitted that he lied about owing the Defendant money but that his "nerves was shot," and he did not want to see the Defendant. The Defendant arrived at the trailer and showed Mr. Jones the black Honda he had purchased for $1,000. He also showed Mr. Buck Jones the pistol he had bought, and Mr. Buck Jones told the Defendant to leave if he was going "to have the gun around." The Defendant put the pistol in his waistband and prepared to leave. Mr. Jones confirmed that it was the same pistol the Defendant had used to shoot Ms. Thompson and Mr. Stewart. Ms. Miller, who had been inside the trailer with Ms. Whitlock, came outside with Ms. Whitlock. Ms. Whitlock told Mr. Jones she was going "somewhere" with the Defendant "real quick." She asked Mr. Jones to join them, and he declined, saying that he was concerned about being seen during the day due to outstanding warrants.

Mr. Jones testified that after Ms. Whitlock left with the Defendant and Ms. Miller, he went back inside the trailer, dressed, and then walked down the driveway. He noticed three white SUVs associated with the Sheriff's Department at "Deb and Hawk's house,"

where they had smoked marijuana before the robbery and shooting. He assumed that the deputies would be at his house next, so he gathered clothing and got a ride to his cousin's house in Newport. He was at his cousin's house for three or four hours before Ms. Whitlock called him, and he warned her that the authorities might be at the Meeks Way trailer. Ms. Whitlock joined him at his cousin's house and they remained there for the next two days.

Mr. Jones testified that while staying with his cousin, he gave the pistol he took from the safe in the victims' apartment to his cousin and asked him to sell it to "Tracey Gribble." Mr. Jones recalled sleeping "a few hours" on Tuesday night and waking up before daylight. He woke Ms. Whitlock, told her to gather her clothes, and arranged for a ride to Sevier County, where they stayed with a friend, Chad Herndon. Mr. Herndon agreed to allow Mr. Jones and Ms. Whitlock stay there for a few days. Several hours later, however, Mr. Herndon called Mr. Jones into the living room and told him that he had just seen a news report showing pictures of Mr. Jones and Ms. Whitlock as "persons of interest" in a murder case. Mr. Herndon said that his sister had already notified the police and that the police were "on the way." Mr. Herndon convinced Mr. Jones to wait for the police but, when the police arrived, Ms. Whitlock ran out the back door into the woods, and Mr. Jones followed her. The couple hid in the woods for a day or two before apprehension.

On cross-examination, Mr. Jones agreed that he was indicted on six counts of first degree murder, allowing the potential for a death sentence or life in prison. He further agreed that he negotiated a plea agreement with the State to serve thirty-five years at 100%. Mr. Jones admitted that he had lied under oath before.

Mr. Jones testified that he had lived with the Defendant but denied that the Defendant "threw" him out because Mr. Jones had robbed the Defendant's cousin. Mr. Jones said that the Defendant used the money he took from Ms. Thompson's body to buy the black Honda. Mr. Jones clarified that, after shooting Ms. Thompson the first time, the Defendant reached between the front seats and "pulled the E brake up" and took Ms. Thompson's cell phone from her lap.

Todd Olden testified that, at the time of trial, he was incarcerated for a drug-related conviction. Mr. Olden identified a photograph of the .38 pistol as the same gun that he had traded to the Defendant for a .22. Mr. Olden recalled that the Defendant came to his house to trade the .22 for crack cocaine. Mr. Olden countered with trading the .22 for Mr. Olden's .38 pistol, and the Defendant agreed.

Mr. Olden testified that on March 11, 2012, the Defendant called him early in the morning wanting to buy some "dope." The Defendant, Mr. Jones, and Ms. Whitlock came to buy the drugs. He said Ms. Whitlock appeared "terrified for her life." Mr. Olden said that the trade involving guns occurred on Thursday or Friday, May 8 or 9, 2012, and the drug buy occurred at approximately 3:00 a.m. on Sunday, March 11, 2012. Mr. Olden said that the Defendant referenced Ms. Thompson on one occasion, saying "[Ms. Thompson] was snitching and you ain't going to have to worry about it."

Derrick Woods, a Cocke County Sheriff's Department captain, testified that Detective Buddy Randolph, a Greene County Sheriff's Department deputy, contacted him on the morning of March 11, 2012, about two bodies law enforcement had found. Captain Woods went to the Greene County Sheriff's Department crime lab and identified the bodies as Mr. Stewart and Ms. Thompson. Captain Woods assisted Greene County authorities with locating the victims' parents and later participated in the search of the victims' Uptown Rental Apartment. He identified photographs of a Crown Royal liquor bottle bag, a bullet, and a hammer recovered from the apartment.

Captain Woods testified that he was not present during the Defendant's interviews, but based upon the Defendant's statements to authorities, Captain Woods sent Detective Kevin Benton and Patrol Lieutenant C.J. Ball to Mr. Roberts's residence to recover a .38 caliber snub-nosed handgun, which was later determined to be the murder weapon.

Kevin Benton, a former Cocke County Sheriff's Department detective, testified that on March 16, 2012, Captain Woods requested that he meet with Lieutenant C.J. Ball at Pigeon Valley Baptist Church before going to Mr. Roberts's residence to retrieve two weapons. Detective Benton and Lieutenant Ball arrived at Mr. Roberts's residence at around midnight, and Mr. Roberts was waiting for them on the porch. Mr. Roberts signed a consent to search form and then went inside to retrieve the weapons. Mr. Roberts brought out two weapons, an I.N.A. and a Colt Cobra, wrapped in a plastic bag. The officers placed the guns into evidence bags.

Mark Dunlap, a Tennessee Bureau of Investigation Crime Laboratory Forensic Scientist, testified as an expert witness in the field of blood DNA. Special Agent Dunlap issued five reports related to this case, with DNA results concerning the Defendant being generally inconclusive.

Jeremy Grooms testified that he was currently serving a twelve-year sentence for theft and evading arrest convictions. Mr. Grooms admitted that he had been "in and out of trouble with the law" for twenty-five years, mostly related to stealing cars. Mr. Grooms confirmed that he knew Ms. Thompson and that, although he did not know Mr. Stewart, he was familiar with Mr. Stewart's father, someone he described as "a good

man." Mr. Grooms recalled that in 2012 he was moved from the Washington County jail to the Greene County jail due to his involvement in a fight. While at the Greene County jail, he met the Defendant, and the two spoke about the murders of Ms. Thompson and Mr. Stewart.

Mr. Grooms testified that the Defendant told him that the murders occurred during a "dope deal" and that "he was going to teach this little n**ger lover about stealing customers." Mr. Grooms said that the Defendant was unaware at the time that Mr. Grooms knew Ms. Thompson. The Defendant told Mr. Grooms that he was in a car with Ms. Thompson and Mr. Stewart and that he shot Mr. Stewart in the back of the head while Mr. Stewart was "rolling a blunt." The Defendant further stated that he shot Ms. Thompson when she turned around in response to the gunfire. The Defendant said they put Ms. Thompson in the back seat, "[a]nd the girl in the back said she's a gurgling, and shot her two or three more times." The Defendant told Mr. Grooms that he was looking for money and a pistol when he went to Mr. Stewart and Ms. Thompson's apartment. The Defendant referred to the incident as "a crack adventure." According to Mr. Grooms, the Defendant told him about taking "a radio and speakers" from the blue Honda and leaving them on Powerline Hill. The Defendant also said Jimtown Road was where they disposed of the victims' belongings. The Defendant said there was "blood all over them," so he had to wash his shoes. Mr. Grooms recalled that the Defendant told him that Mr. Jones helped him get the "fat son-of-a-bitch out" of the Honda. The Defendant referred to Mr. Jones as "a snitching whore" and said he wanted Mr. Jones "eliminated." He offered Mr. Grooms $500 to "see what [he] could get done about it."

On cross-examination, defense counsel reviewed with Mr. Grooms his numerous criminal convictions. Mr. Grooms stated that he was testifying because Ms. Thompson was his nephew's friend and because the Defendant had admitted to him that he killed Ms. Thompson and Mr. Stewart. Mr. Grooms admitted that he had stolen around 100 cars and agreed that he had "lived the criminal lifestyle." Mr. Grooms denied knowing Mr. Jones or Ms. Whitlock.

Alex Broadhag, a TBI special agent firearms examiner, testified as an expert witness in the field of firearms examination. Special Agent Broadhag testified that he examined a Colt .38 Special revolver at the TBI Crime Laboratory. The Colt .38 Special revolver was the pistol that had been identified as the pistol used by the Defendant to shoot both victims. Special Agent Broadhag determined that the bullet fragments recovered from the victims' bodies during the autopsy had been fired from the Colt .38 Special revolver that he examined. Special Agent Broadhag also examined Ms. Thompson's Coogie aviator hat and made the determination that the muzzle of the murder weapon was less than eighteen inches from Ms. Thompson's head when fired.

Special Agent Broadhag also examined a red watch cap. He stated that the muzzle of the murder weapon was held a maximum of five feet from the hat at the time of the shooting.

The State concluded its case-in-chief, and the defense presented the following witnesses: Eric Ballard testified that, although he no longer used drugs, he was an addict. He said that Mr. Jones lived with him for a brief period of time but that Mr. Ballard asked Mr. Jones to leave because "[s]tuff started disappearing from my home." Mr. Ballard said that on Sunday, March 11, 2012, Mr. Jones asked to meet to discuss Mr. Ballard purchasing a pistol. Mr. Jones said the gun was a revolver, and Mr. Jones wanted either crack cocaine or $100 for the gun.

On cross-examination, Mr. Ballard testified that he no longer owned his home due to "[d]rugs." He said that he was currently living at the Defendant's nephew's house. Mr. Ballard said that he believed the gun Mr. Jones was trying to sell was silver. Mr. Ballard admitted that he had, within the last week, spoken to the Defendant on the telephone.

Patricia Autry testified that she "had a problem with crack cocaine and marijuana." She stated that she had not used crack cocaine in five years. Ms. Autry said that around the time of the murders, Ms. Whitlock was angry and hostile. Ms. Autry recalled that "shortly after the murder," she saw Mr. Jones with a white pearl-handled gun. She watched Mr. Jones hand the gun in a towel to Mr. Ballard. Mr. Ballard looked at the gun and then handed it back saying, "he couldn't do nothing with it."

Vincent Tweed, a Greene County Sheriff's Department detective, testified that he was involved in the investigation and while the investigation was ongoing "Mr. Nance" was a potential suspect who was later eliminated. Lieutenant Tweed confirmed that the investigation revealed that Tracey Gribble bought the Smith & Wesson .380, recovered with the murder weapon, from Mr. Jones. Lieutenant Tweet agreed that he did not obtain the Defendant's cell phone records based on the information he had that the Defendant "passed his phone off to Teresa Miller" before the murders.

On cross-examination, Lieutenant Tweed testified that initially the police developed numerous potential suspects but that all were eliminated except for four: the Defendant, Mr. Jones, Ms. Whitlock, and Ms. Miller.

Chuck Bolin testified that he had been "clean" since 2014 when he was incarcerated for drug-related charges. While incarcerated he had the opportunity to meet and talk with Mr. Jones. Mr. Jones told Mr. Bolin that he "wanted to be bigger than Bonnie and Clyde," and that "he wanted to go out with a bang." Mr. Bolin also said that Mr. Jones told him that he would have "no problems at all" with killing someone "if it

ever come down to it." About the night of the murders, Mr. Bolin said that Mr. Jones told him that he was robbing the victims when "the gun just went off." He said that Mr. Jones never mentioned the Defendant being in the car at the time of the shooting but said that he wanted to "set up" the Defendant because the Defendant had "short[ed] him on drugs." Mr. Bolin described Mr. Jones as "crazy," saying Mr. Jones "wanted to raise hell, and party" and that Mr. Jones said he would be "happy to die in prison."

On cross-examination, Mr. Bolin testified that he was the Defendant's cell mate and that he and the Defendant had discussed the case "a little bit." Mr. Bolin agreed that, in addition to his drug-related convictions, he had been convicted of attempted aggravated burglary and theft.

In rebuttal, the State recalled Mr. Jones who testified that he did not know Mr. Bolin and had never spoken with him.

After hearing this evidence, the jury convicted the Defendant of two counts of first degree premeditated murder and four counts of felony murder. The trial court imposed concurrent life sentences for each conviction. It is from these judgments that the Defendant appeals.

## II. Analysis

On appeal the Defendant asserts that the evidence is insufficient to support his convictions for first degree murder. He contends that the evidence does not establish that he committed the murders. The State responds that the record supports the jury's finding that the Defendant acted with premeditation when he shot and killed Ms. Thompson and Mr. Stewart. We agree with the State.

### A. Sufficiency of the Evidence

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury

decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

**1. First Degree Premeditated Murder**

First degree murder is defined as a "premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1) (2014). Premeditation refers to "an act done after the exercise of reflection and judgment." T.C.A. § 39-13-202(d) (2014). Whether the defendant premeditated the killing is for the jury to decide, and the jury may look at the circumstances of the killing to decide that issue. *Bland*, 958 S.W.2d at 660. The Tennessee Code states that, while "the intent to kill must have been formed prior to the act itself," that purpose need not "pre-exist in the mind of the accused for any definite period of time" for a defendant to have premeditated the killing. T.C.A. § 39-13-202(d) (2014).

The following factors have been accepted as actions that demonstrate the existence of premeditation: the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, and calmness immediately after the killing. *Bland*, 958 S.W.2d at 660. In addition, a jury may consider destruction or secretion of evidence of the murder and "the planning activities by the appellant prior to the killing, the appellant's prior relationship with the victim, and the nature of the killing." *State v. Nichols*, 24 S.W.3d 297, 302 (Tenn. 2000); *State v. Halake*, 102 S.W.3d 661, 668 (Tenn. Crim. App. 2001) (citing *State v. Gentry*, 881 S.W.2d 1, 4-5 (Tenn. Crim. App. 1993)). Also, "[e]stablishment of a motive for the killing is a factor from which the jury may infer premeditation." *State v. Leach*, 148 S.W.3d 42, 54 (Tenn. 2004).

The evidence, viewed in the light most favorable to the State, showed that the Defendant was angry with Ms. Thompson for stealing Mr. Roberts's money and some of his "clients." He believed Ms. Thompson had stolen the money because she knew where the money was kept after seeing the Defendant retrieve money from Mr. Roberts's top dresser drawer during a recent drug transaction. The Defendant plotted with Mr. Jones a plan to recover the money. The Defendant armed himself with a .38 pistol. He offered Mr. Jones $500 and ten Roxys to participate in the robbery. The Defendant and Ms. Thompson argued while in her car together. When Mr. Stewart defended Ms. Thompson, the Defendant shot him in the head and then shot Ms. Thompson in the head. Both victims sustained more than one gunshot wound and were seated in the front seats of the car with their backs to the Defendant. The Defendant, Mr. Jones, and Ms. Whitlock dumped the bodies and disposed of the victims' belongings after the Defendant removed cash and drugs from Ms. Thompson's body. The Defendant told Ms. Whitlock, "This is what happens to people that rob me, snitch on me or F me over." The Defendant went to the victims' apartment following the murders and hunted for drugs and/or money. The Defendant orchestrated the disposal of Ms. Thompson's cars. The evidence showed that the victims were unarmed, and Ms. Thompson was driving the Honda at the time of the shooting. The Defendant remained calm after the shooting while directing the disposal of

the bodies, stealing from the victims, and coordinating a cleanup of the evidence. Viewing the evidence in the light most favorable to the State, a jury could reasonably find that the Defendant killed Ms. Thompson and Mr. Stewart after the exercise of reflection and judgment.

We conclude that this is sufficient evidence upon which a jury could find that the Defendant acted with premeditation when he killed the victims. The Defendant is not entitled to relief.

## 2. First Degree Felony Murder

Felony murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, act of terrorism, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, aggravated child neglect, or aircraft piracy ." T.C.A. § 39-13-202(a)(2) (2014). In this case, the Defendant was convicted of first degree felony murder in the perpetration of the robbery or attempted robbery of Mr. Stewart and Ms. Thompson. The Defendant was also convicted of first degree felony in the perpetration of the theft or attempted theft of Mr. Stewart and Ms. Thompson. The mental state required for the conviction was that the Defendant possessed the intent to commit the underlying offense, which in this case was robbery and theft. Robbery is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." T.C.A. § 39-13-40 (2014). Theft is when a person acts "with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent. T.C.A. § 39-14-103 (2014).

The evidence, viewed in the light most favorable to the State, proves that the Defendant planned and attempted to execute the robbery of the victims. While armed, the Defendant, with Mr. Jones's help, procured a ride in Ms. Thompson's car under the guise of needing transportation to purchase pills in Greeneville. During the course of the robbery, the Defendant shot Ms. Thompson and Mr. Stewart, who both died as a result of gunshot wounds. The Defendant possessed the intent to commit the underlying offense, the robbery, and Mr. Stewart and Ms. Thompson were killed during the perpetration of the robbery. In the alternative counts of theft, the Defendant planned to recover his father's stolen money and after killing the victims, he took cash and drugs from Ms. Thompson's body. He then went to Mr. Stewart and Ms. Thompson's apartment in Ms. Thompson's blue Honda and took guns, bed sheets, and a BMW without consent. Accordingly, we conclude the evidence is sufficient to support the jury's finding that the Defendant was guilty beyond a reasonable doubt of first degree murder in the perpetration of a robbery and in the perpetration of a theft. As such, the Defendant is not entitled to relief on this issue.

## B. Merger

The Defendant, in a footnote, mentions that the judgment forms do not merge the first degree premeditated murder and first degree felony murder convictions, citing *State v. Price*, 46 S. W.3d 785, 824 (Tenn. Crim. App. 2000). The State agrees that the felony murder convictions should merge with the first degree premeditated murder convictions. Under the law of merger, when a defendant is convicted under two alternative theories for the same offense, "the greater charge stands and the guilty verdict on the lesser charge merges into the greater charge." *State v. Banes*, 874 S.W.2d 73, 81 (Tenn. Crim. App. 1993), *overruled on other grounds by State v. Williams*, 977 S.W.2d 101, 105 (Tenn. 1998). In this case, the sentences for the six convictions are concurrent, but none of the counts are merged. As such, we remand the case for the trial court to merge Counts 3 and 5 into Count 1 for the murder of Mr. Stewart, and to merge Counts 4 and 6 into Count 2 for the murder of Ms. Thompson. *See State v. Berry*, 503 S.W.3d 360, 362-63 (Tenn. 2015).

## III. Conclusion

Based on the above mentioned reasoning and authorities, we affirm the trial court's judgments. We remand the case for the merger of Counts 3 and 5 into Count 1 for the murder of Ms. Steward; and Counts 4 and 6 into Count 2 for the murder of Ms. Thompson.

_____
ROBERT W. WEDEMEYER, JUDGE